UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

ISABELLE GUZMAN,

                Plaintiff,               06 Civ. 3966

   -against-                           OPINION

UNITED STATES OF AMERICA,
WACKENHUT CORPORATION, AND L3
COMMUNICATIONS, SECURITY DETECTION
SYSTEMS CORPORATION,

                Defendants.

-------------------------------------X

A P P E A R A N C E S:

                Attorneys for Plaintiff

                PRESTON WILKINS & MARTIN
                65 Broadway, Suite 508
                New York, NY  10006
                By:  Gregory R. Preston, Esq.

                Attorneys for Defendant
                Wackenhut Corporation

                AHMUTY, DEMERS & MCMANUS
                200 I.U. Willets Road
                Albertson, NY  11507
                By:  Frank J. Pecorelli, Jr., Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11-16-09

**Sweet, D.J.**

Defendant, the Wackenhut Corporation ("Wackenhut" or the "Defendant") has moved under Rule 56, Fed. R. Civ. P., for summary judgment to dismiss the personal injury complaint (the "Complaint") of the plaintiff, Isabelle Guzman ("Guzman" or the "Plaintiff"), and the cross claims of the other defendants for contribution and indemnity (the "Cross Claims").  On the facts and conclusions set forth below, the motion is granted, and the Complaint and Cross Claims will be dismissed.

## I.   PRIOR PROCEEDINGS

The Complaint filed by Guzman on May 24, 2006 alleges that Guzman, a FedCap employee stationed at the Statue of Liberty, was injured when her hand was drawn into a gap or "pinch point" between the conveyer belt and the loading section of the x-ray machine she was cleaning and that was being operated by a Wackenhut employee.  Discovery proceeded.

The instant motion was heard and marked fully submitted on May 13, 2009.

1

## II. THE FACTS

The facts are set forth in the parties' Local Rule 56.1 Statements and are not in dispute except as noted below.

The Statue of Liberty (the "Statue"), located on Liberty Island in the State of New York, is a national monument controlled and operated by the National Parks Service ("NPS"), a division of the Department of the Interior. In 2004, NPS entered into an agreement with L-3 Communications, Security Detection Systems Corporation ("L3") wherein L3 agreed to provide NPS with an advanced x-ray detection system. L3 also contracted with NPS to provide NPS with a "4-year platinum scheduled maintenance" program which included a litany of additional maintenance and repair services, including "all necessary parts, labor and . . . annual preventive maintenance." Statement of Facts Pursuant to Local Rule 56.1 ("Statement of Facts") ¶ 13.

FedCap, Plaintiff's employer, was contracted by NPS to provide cleaning services at the subject location.

2

The Technical Specifications for Custodial and Janitorial Services issued by NPS sets forth that "the contractor shall provide management, supervision, manpower, equipment and supplies necessary to provide custodial and related services." Id. ¶ 8. The specifications further provide that such services are to be provided in and around the perimeter of the security screening tent of the subject location and state that "the contractor shall arrange for satisfactory supervision of the contract work." Id. ¶ 9. The specifications also state that "the contractor shall provide a full time manager who shall be responsible for the competent performance of the work." Id.

NPS entered into an agreement with Wackenhut to provide security services at the Statue. According to the contract, Wackenhut had the following duties at the subject site:

- Protect government property.

- Provide safety for guests.

- Maintain a lookout for fire, floods and other catastrophes on the site.

- Report any and all hostile threats against the facility.

- Report any complaints.

- Maintain proper scheduling for security
  personnel.

- Direct traffic and parking.

- Maintain all necessary reports and logs.

Id. ¶ 11. Wackenhut was also retained to operate the x-ray
machines. It was not retained as a general contractor, nor
was it retained to provide general oversight at the subject
location.

Lieutenant Charles Guddemi ("Lt. Gudemmi") of the
NPS Police force was the second-in-command on site at the
Statue. Lt. Guddemi's responsibilities included overseeing
daily operations of the site; ensuring adequate staffing
levels; ensuring that all training requirements were
fulfilled; overseeing contracted guard operations; ensuring
that the security technology was functioning properly;
coordinating special events; and liaising with other
jurisdictions and outside agencies.

NPS, through Lt. Guddemi, worked with L3 to
devise a cleaning protocol for the cleaning of the belts of
the x-ray machine. With respect to his conversation with
an L3 representative, Lt. Guddemi testified:

A.    . . . I said we need to come up with
      solution for this.  We watched as the
      process was going on.  I said there should
      be an easy way to clean this.  There was a
      FedCap employee in the [security] tent at
      that time.

Q.    Do you remember the name of this individual?

A.    I do not.  The individual had a spray bottle
      with cleaning solution and a rag.  He took
      the spray bottle and a rag from the
      individual.

Q.    Who did?

A.    Mark Bush [an L3 employee].  Then standing
      on the entrance side of the x-ray machine,
      just said if we spray some solution on the
      rag and put it down on the entrance side of
      the conveyor belt while it's operating, the
      friction will keep cleaning the belt.  When
      he demonstrated it, some of the dirt started
      to come off and you could see the color
      green appear.

Id. ¶ 2.


        Under the protocol developed by Lt. Guddemi and

L3, a Wackenhut security guard would turn on the machine at

the request of a FedCap employee when the machine was to be

cleaned.  Lt. Guddemi testified that he did not direct that

the Wackenhut guard remain at the controls during the

cleaning:

Q.   Again, just so we're clear, this is your
     expectation, that the Wackenhut guard would
     stay at the controls as the FedCap employee
     is cleaning the machine, correct?

A.   It would have been my expectation since the
     only one authorized to operate the machine
     would have been the contracted guard force.

Q.   That's what you communicated to the
     Wackenhut guard force, would that be fair to
     say?

A.   No.

Q.   Why is that not fair to say?

A.   I do not recall making that communication,
     stating that the guard would have to stay
     there when the machine was operating.

Id. ¶ 4.


     Lt. Guddemi never discussed the procedure for
cleaning the conveyor belt of the x-ray machine with anyone
from Wackenhut besides alerting Wackenhut that it was
required to turn the conveyor belt on when asked by FedCap
employees.  However, Lt. Guddemi informed FedCap, through
its NPS liason Bill Rivera ("Rivera"), of the safe
procedures for cleaning the conveyor belt:


     Q.   Did you talk to him about the procedure as
          to how the cleaning of the belts was
          supposed to work?

6

> A.   Yes, I mentioned to him the direction
>      because I was concerned about the safety
>      issue.

Id. ¶ 5.  Lt. Guddemi further testified that he

specifically informed Rivera of the potential dangers

associated with cleaning the machine:

> Q.   Did you tell Mr. Rivera the procedure as to
>      how the machine was to be cleaned?
>
> A.   . . . Yes.
>
> Q.   . . . What did you tell him?
>
> A.   This is the concern, when we clean the
>      machines from a safety standpoint, to make
>      sure they're on the entrance side, and
>      explained – the concern was if they would
>      slip and lose the rag, we would just lose
>      the rag into the x-ray machine.  If you were
>      on the other side going against the
>      friction, you could end up getting hurt with
>      the transition between the conveyor belt and
>      the slide that we have.

Id. ¶ 3.  Rivera, however, testified that Lt. Guddemi never

told him about the procedure or the hazards of cleaning the

x-ray machine while the belt was moving.

At the time of the incident leading to the

present lawsuit, Guzman was employed by FedCap at the

Statue.  Prior to that, she had been an employee of FedCap
since 1993.

Guzman testified that her typical duties included
mopping, sweeping, cleaning bathrooms, dusting, and picking
up trash, and if she was scheduled on a Monday, Wednesday
or a Friday, her duties included cleaning the subject x-ray
machine.  According to Wackenhut, Guzman was only required
initially to clean the exterior of the x-ray machine.  In
2004, pursuant to a directive from NPS, FedCap was required
to clean the moving conveyor belt.

According to Guzman, she was directed to clean
the x-ray machines by NPS officials and her supervisors
from FedCap, but nobody instructed her in the proper method
for cleaning the machine:

> Q.  And what does that mean to clean the
>     machine?
>
> A.  When - they they send them a memo saying
>     that we had to clean machines, the inner of
>     the machines. No more out - outer and inner.
>
> Q.  Did anyone instruct you to do that?
>
> A.  It was my - Julio [a FedCap Supervisor] told
>     everyone whoever works in the tents to clean
>     the inner of the machine.

\*   \*   \*

Q.   Did he tell you how to clean the inner of the machine?

A.   Nobody showed us.  They just – the lieutenant came around, Guddemi, and told us to use a spray bottle and rag.

Q.   Was anything else told to you?

A.   Just to clean the machines.

Q.   Did FedCap - did your supervisor at FedCap at any point show you how to clean the machine?

A.   No.

Q.   Did any of your coworkers show you how to clean the machine?

A.   No.  The lieutenant just told us to use a rag and a spray bottle.

Q.   Who did you take your instructions from?

A.   From Julio.  But he came around to the tent and told us that we -

Q.   Who is "he?"

A.   The lieutenant [Guddemi]…

Q.   Okay.

A.   Showed us a bottle and a rag and he says, this is how you clean the machine.  That's it.

Q.   He actually showed you how to clean the machine?

A.   No.  He just said this is the bottle and a rag.

9

Id. ¶¶ 18, 19.


On September 16, 2005, at approximately 8:15
A.M., Guzman was "wiping the conveyor belt of the x-ray
machine on lane number three with a rag when her hand got
pulled into the machine between the belt and the first
metal roller."  Id. ¶ 20.


Guzman filed a Notice of Claim with NPS in
accordance with the requirements of the Federal Torts
Claims Act.  Thereafter, NPS convened a Board of Inquiry
(the "NPS Board" or "Board") and commenced a full
investigation into the incident, the findings for which
were released in January of 2006.


According to the Board's findings, several
discouraged practices were utilized in cleaning the
conveyor belts, including cleaning the belts while the
machine was running and failing to use a swifter-type
cleaning device in order to avoid direct contact with the
conveyor belt.  The Board further found that "Sgt.
Nurdeen's [a Wackenhut employee] quick action with stopping
and reversing the belt is highly commendable" and that "the

NPS will prepare a formal letter of commendation to Sgt. Mohammed Nurdeen for his quick and professional actions that he performed during the incident." Id. ¶ 25.   In addition, the expert retained by L3, Clyde C. Richard, Ph.D. ("Dr. Richard"), opined that "[b]ecause of the speed at which [Guzman's] accident occurred, it would not be possible for someone at the control console to prevent the entrapment of Ms. Guzman's hand." Id. ¶ 28.

## III. THE APPLICABLE STANDARD

Summary judgment is granted only where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 338 (2d Cir. 2004). The courts do not try issues of fact on a motion for summary judgment, but, rather, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

11

"The party seeking summary judgment bears the
burden of establishing that no genuine issue of material
fact exists and that the undisputed facts establish [its]
right to judgment as a matter of law." Rodriguez v. City
of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995).  In
determining whether a genuine issue of material fact
exists, a court must resolve all ambiguities and draw all
reasonable inferences against the moving party.  See
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.
574, 587 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18
(2d Cir. 2002).  However, "the non-moving party may not
rely simply on conclusory allegations or speculation to
avoid summary judgment, but instead must offer evidence to
show that its version of the events is not wholly
fanciful."  Morris v. Lindau, 196 F.3d 102, 109 (2d Cir.
1999) (internal quotes omitted).  Summary judgment is
appropriate where the moving party has shown that "little
or no evidence may be found in support of the nonmoving
party's case.  When no rational jury could find in favor of
the nonmoving party because the evidence to support its
case is so slight, there is no genuine issue of material
fact and a grant of summary judgment is proper."  Gallo v.

Prudential Residential Servs., L.P., 22 F.3d 1219, 1223-24
(2d Cir. 1994) (citations omitted).


## IV.  NO WACKENHUT DUTY OF CARE TOWARDS THE PLAINTIFF HAS BEEN ESTABLISHED

To establish a prima facie case of negligence, a
plaintiff must demonstrate the existence of a duty, a
breach of that duty, and that the breach of such duty was
the proximate cause of his or her injuries.  Gordon v.
Muchnick, 579 N.Y.S.2d 745, 746 (App. Div. 1992).  A
defendant must have owed a duty of reasonable care to the
particular plaintiff; absent such a duty, there can be no
breach thereof and no liability.  See Palsgraf v. Long
Island R.R. Co., 162 N.E. 99, 100 (N.Y. 1928); Gordon, 579
N.Y.S.2d at 746.  Where the facts concerning the
relationship between the parties and the circumstances
surrounding the occurrence are undisputed, the
determination of whether a duty exists and negligence may
be found is a question of law appropriate for summary
judgment.  Gordon, 579 N.Y.S.2d at 746; see also Palka v.
Edelman, 358 N.E.2d 1019, 1020 (N.Y. 1976); Caserta v.
Pennisi, 305 N.Y.S.2d 351, 352 (App. Div. 1969); Restivo v.
Conklin, 157 N.Y.S. 627, 629 (App. Div. 1916); Carrillo v.
Kreckel, 352 N.Y.S.2d 730, 732 (App. Div. 1974).  The

13

determination of whether a duty exists is based on a careful inquiry whereby common sense, science, and policy play an important role in determining whether to impute liability for the damage suffered by one onto another. Waters v. N.Y. City Hous. Auth., 505 N.E.2d 922, 923 (N.Y. 1987) (citing De Angelis v. Lutheran Med. Ctr., 449 N.E.2d 406, 407 (N.Y. 1987)).

Plaintiff was an employee of FedCap, a company that was contracted by NPS to provide certain cleaning services at the subject site and other similar government owned facilities. FedCap was hired as an independent contractor and maintained control over the means and methods by which its employees performed these cleaning services.

Wackenhut was also hired by NPS as an independent contractor to provide general security services at the Statue and other government owned facilities. At the Statue, Wackenhut employees were expected to: 1) allow FedCap employees access to the x-ray screening device; 2) to activate the device at the request of FedCap employees; and 3) to keep track of how often FedCap employees cleaned the belts. Wackenhut and FedCap employees worked side-by-

14

side as separate, private contractors hired by the Federal
Government and served at the pleasure and direction of NPS.
Oversight of the Statue was the duty of the NPS.  Oversight
of individual employees fell to supervisors appointed by
the contracting entities.

Under this arrangement, Wackenhut had no
authority to supervise or control the work of other on-site
contractors' employees.  Nor did it do so, according to
Guzman, who testified that she took direction solely from
her FedCap supervisors and from NPS officers such as Lt.
Guddemi.  The only entity with the direct contractual
authority to exert control over the means and methods
utilized by FedCap employees, besides FedCap itself, was
NPS.

As a general rule, negligence will not attach in
such circumstances, where the first entity had no direct
ability to control or direct the method in which the other
entity, an independent contractor, performs his or her
work.  See Kleeman v. Rheingold, 614 N.E.2d 712, 715 (N.Y.
1993); Cun-En Lin v. Holy Family Monuments, 796 N.Y.S.2d
684, 686 (App. Div. 2005) ("[T]here is no liability under
the common-law or [New York] Labor Law § 200 unless the

15

owner or general contractor exercised supervision or
control over the work performed." (citations omitted));
Russin v. Louis N. Picciano & Son, 429 N.E.2d 805, 807
(N.Y. 1987) ("An implicit precondition to [the duty to
provide a safe construction site] is that the party charged
with that responsibility have the authority to control the
activity bringing about the injury to enable it to avoid or
correct an unsafe condition." (citation omitted)).

    Further, the duty of care of a subcontractor
requires that he perform the work for which he is
contracted and does not dictate that he make additional
efforts beyond the scope of his contract that perfect
hindsight indicates he should have taken.  See Rodriguez by
Rodriguez v. Presbyterian Hosp., 688 N.Y.S.2d 120, 122
(App. Div. 1999) (holding that contractor "had no duty to
go beyond the specifications of its contract to detect and
warn of other latent hazards or defective conditions."
(citing Stern v. 522 Shore Rd. Owners, 655 N.Y.S.2d 51, 53
(App. Div. 1997))); see also Russin, 429 N.E.2d at 808; H.
R. Moch Co. v. Rensselaer Water Co., 159 N.E. 896, 897-98
(N.Y. 1927); Lippman v. Island Helicopter Corp., 670
N.Y.S.2d 529, 529-30 (App. Div. 1988).

16

The undisputed evidence in the record establishes
that Plaintiff's injuries were caused either by a defect in
the design or manufacture of the x-ray machine or by a
defect in the protocols implemented to clean the machine.
Wackenhut was contracted to provide access to the machine
and to turn the machine on when asked.  No evidence on the
record suggests that Wackenhut had any involvement in the
design and manufacture of the machine, and Guzman has
testified that no one from Wackenhut ever instructed her to
clean the machines or prescribe a method by which she was
to perform this task.  The undisputed evidence therefore
establishes that Wackenhut's contractual duties did not
extend to ensuring the safe cleaning of the machine by
other subcontractors over which it had no authority or
control.

Moreover, Guzman has not demonstrated that some
"failure" or "omission" on the part of Wackenhut
proximately caused her injuries.  To the contrary, the
actions of Sgt. Nurdeen, the Wackenhut security guard at
the subject site on the date of the incident, were
"commendable," according to the findings by the NPS Board.
Furthermore, the uncontested findings of L3's expert, Dr.
Richard, established that even if the control panel of the

machine had been manned while Guzman cleaned the conveyor belt, the speed at which her hand was drawn into the pinch-point on the belt would have prevented the machine from being deactivated in time to prevent her injury.

Guzman has failed as a matter of law to demonstrate that Wackenhut owed Guzman a duty of care. Where a plaintiff cannot demonstrate that a defendant owed the plaintiff a duty of care, negligence cannot attach. See Palsgraf, 162 N.E. at 100; Gordon, 579 N.Y.S.2d at 746. Guzman's claims against Wackenhut for common law negligence are dismissed.

## VI.  CONCLUSION

Upon the facts and conclusions set forth above, the motion of Wackenhut is granted and the complaint of Guzman and the cross-claims for contribution and indemnification are dismissed with prejudice.

Submit judgment on notice.

So ordered.

18

New York, N.Y.
November  /6 , 2009

ROBERT W. SWEET
U.S.D.J.